ACORD et al. v. WESTERN POCAHONTAS CORPORATION.

(Circuit Court, S. D. West Virginia.   November 22, 1907.)

**1. EQUITY—BILL OF REVIEW—GROUNDS.**

A bill of review is maintainable after the term of entry of final decree generally for two reasons: First, for error therein apparent upon its face; and, second, on account of newly discovered evidence, material in character, that could not earlier have been discovered with due diligence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 1078–1094.]

**2. SAME—ERROR OF LAW.**

Where error of law is the ground assigned in a bill of review, it must be shown from the pleadings, proceedings, and decree, without reference to the evidence, and no other question is open.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 1075–1082.]

**3. SAME—DEMURRER TO BILL OF REVIEW.**

To a bill of review for errors of law a demurrer is both admissible and proper; and, as questions of fact are not open for re-examination on such a bill of review, the truth of any fact averred in the bill inconsistent with the decree is not admitted by a demurrer.   Since no error can be assigned on such fact, it is not properly pleaded.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 1125.]

**4. SAME—LEAVE TO FILE—NEW MATTER.**

A bill of review for errors of law can be filed without leave of the court, but one based on newly discovered evidence only by such leave, which rests in the sound discretion of the court; and even if such evidence would have changed the decree the court may refuse to reopen the decree, if productive of mischief to innocent parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 1111.]

**5. SAME—NEWLY DISCOVERED EVIDENCE.**

To sustain a bill of review based on newly discovered evidence, such evidence must be new, or else such as the party could not by diligence have known, and the failure to produce it, if existent at the time of the decree must be accounted for.   It must be controlling, not merely cumulative, not mere impeachment of witnesses, nor only increasing doubt as to the real truth.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 1091–1094.]

**6. SAME—JOINDER OF GROUNDS.**

The two grounds of error of law in a decree and newly discovered evidence may be joined in the same bill of review, which in such case may be filed by leave of the court; the objection of multifariousness, if urged, being largely within the sound discretion of the court and dependent to a very considerable extent on the particular facts of each case.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 1123.]

**7. SAME—DECREE REVIEWABLE.**

Under the practice of the federal courts a bill of review based on newly discovered evidence will lie, although the decree was entered by default.

**8. SAME—INSUFFICIENCY OF BILL—PRACTICE.**

Where neither error of law nor newly discovered evidence is shown by a bill of review, leave to file it may be refused. or, if granted. the bill may be dismissed because leave to file was improvidently granted.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 1113.]

9. SAME—NATURE OF REMEDY.

A bill of review for error of law is in the nature of a writ of error, and must be governed practically by the same rules governing appellate courts in considering writs of error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 1065–1069.]

10. SAME—OBJECTION TO EQUITY JURISDICTION—WAIVER.

Failure to make objection to equitable jurisdiction because of an adequate remedy at law before final hearing is a waiver thereof, and authorizes the court to retain the cause if the case be one of such a nature that equity might give the relief asked; or any part of it, or if the question of equitable jurisdiction be even a doubtful one; and such rule is applicable where the objection is made for the first time in a bill of review for errors of law in a decree entered on default, and the question for determination in such case is whether the bill upon which the decree was based, taking its allegations of fact to be true, stated cause of action for equitable relief.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 119, 120.]

11. QUIETING TITLE—JURISDICTION—CLOUD ON TITLE—CANCELLATION OF INSTRUMENTS.

A bill which alleges that complainant is the absolute owner of certain lands, that defendants were in possession thereof as tenants of complainant under written leases and having no other right or title thereto, and that they conspired together to defraud complainant of such lands, and in pursuance of such conspiracy executed deeds to one another purporting to convey title to specific parts of such lands, which deeds they caused to be recorded, states a cause of action cognizable in a federal court of equity for the cancellation of such deeds as clouds upon complainant's title.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Quieting Title, §§ 69–77.]

12. SAME—NATURE OF INSTRUMENT.

Any deed, devise, or other instrument, judgment, or decree not void on its face, which purports to convey any interest in or makes any charge upon land of the true owner, and the invalidity of which must be established by extrinsic evidence, or which, if left undisturbed, may ripen into a perfect title, is a cloud upon the legal title of the owner in possession under the law of West Virginia, and a suit in equity for its cancellation may be maintained in a federal court in that state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Quieting Title, §§ 14–33.]

13. SAME—PERSON ENTITLED TO MAINTAIN SUIT—ESTOPPEL.

The institution of an action in ejectment in a federal court in West Virginia, which, being governed by the state law and practice, may be maintained, although the plaintiff is not out of possession, is not an admission by such plaintiff that he is not in possession, so as to preclude him from maintaining a suit in equity against the defendant to remove a cloud on his title to the same lands.

14. COURTS—JURISDICTION—FEDERAL COURTS.

The jurisdiction of a federal court of equity is not ousted because a state statute has given complainant a remedy by an action at law.

[Ed. Note.—Jurisdiction as affected by state laws, see note to Barling v. Bank of British North America, 1 C. C. A. 513.]

15. SAME—FRAUD ON JURISDICTION.

The facts that a domestic corporation permitted a mortgage on lands owned by it to be foreclosed, and that another corporation having in part the same officers and stockholders was organized in another state, which purchased such lands at the sale and also the stock of the former cor-

poration, which was thereafter dissolved, *held* not sufficient to establish a collusive transfer of the lands, for the purpose of enabling a suit in respect thereto to be brought in a federal court, such as deprived it of jurisdiction of such suit.

**16. SAME—OBJECTION TO JURISDICTION—TIME OF TAKING.**

Objection to the jurisdiction of a federal court in a suit on the ground that a collusive transfer of the property which is the subject of the suit was made for the purpose of conferring such jurisdiction cannot be taken for the first time in a bill of review after final decree has been entered and the term has ended.

**17. EQUITY—BILL OF REVIEW—NEWLY DISCOVERED EVIDENCE.**

A bill of review based on newly discovered evidence *held* insufficient in its showing of due diligence, where the facts existed before the entry of the decree assailed, and were largely shown by public records, and the only excuse for the nondiscovery was the poverty and ignorance of the parties filing the same and the default of their own counsel, not claimed to have been fraudulent or collusive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 1091–1094.]

In Equity. On demurrer to bill of review.

On June 16, 1906, in term, the Western Pocahontas Corporation presented its bill in this court against Abraham Acord and some 71 others, in which it alleged itself to be a corporation under the laws of Virginia and the defendants named to be citizens and residents of West Virginia; that it was the owner of 28,113 acres of land, situate in Wyoming and Raleigh counties, derived by it through mesne conveyances from two patents issued by the commonwealth of Virginia, the one on February 11, 1797, to James Welch for 90,000 acres, and the other on June 25, 1795, to Wilson Carey Nicholas for 500,000 acres; and in support of this allegation it filed with said bill, as parts thereof, office copies of conveyances and other records showing a perfect chain of title from said patentees to it for said 28,113 acres. The bill then alleges that in the year 1884 plaintiff's predecessors in title took the actual adversary possession of said tract of land and placed thereon some 73 tenants under written leases, copies of which are exhibited as parts of the bill, which tenancies, created from that year to the year 1892 and continued uninterrupted until the present time, embraced each part and all of said land, whereby actual, continuous, peaceable, exclusive, notorious, hostile, and adversary possession of said tract of land has been maintained by plaintiff and its predecessors in title from said year 1884 to the present time; that all taxes assessed and assessable against said land have been paid; that the tract has been duly and regularly entered on the land books of the proper counties, and has never become forfeited; that plaintiff is the owner in fee simple, and has the open, notorious, exclusive, hostile, peaceable, and adverse possession thereof; that on or about April 1, 1905, certain of said tenants of plaintiff, named, entered into an agreement among themselves and with the other tenants, named, to combine for the purpose of attempting to take from the plaintiff certain portions of its said land, and for that purpose they, with others, defendants named, met and organized a lodge or society called the "Citizens Union," adopted articles of agreement or association, elected officers, selected a meeting place, levied and collected and still continue to levy and collect monthly dues from the membership in aid of this organization, charged to be a secret one, guarded by an oath of secrecy administered to each one at the time of becoming a member thereof; that in pursuance of said combination the members of said "Citizens Union" agreed among themselves to execute deeds, one to the other for such parts or parcels of plaintiff's said land, in their possession as its tenants, as each one desired to possess, and engaged the county surveyor of Wyoming county and another to survey out the particular portions each desired, so that the boundaries thereof could be defined, which surveying was done, and deeds of conveyance, one to the other, were executed and placed upon record for each one's selected parcel. Copies of these deeds,

more than 50 in number, are exhibited with the bill. It is further charged that no surrender was made by said tenants prior to the taking of said deeds by them of the premises held by them, but they immediately began to assert hostile claims to such lands; that they have no right and never had any claim of title whatever except as contained in these deeds made by them when tenants of plaintiff one to the other. The bill then charges that, so soon as informed and advised of these proceedings, it instituted on the law side of this court an action of ejectment against said defendants, which is pending; that in the ordinary course of procedure it would be impossible to try more than one or two of defendant's claims in any one trial, and that to prosecute said action of ejectment to a final conclusion would require from 25 to 30 years; that the costs and expenses would ultimately exceed the value of the land in controversy; that judgment for costs could not be collected, and that by intervention on the part of equity a great multiplicity of suits would be avoided, enormous costs saved, and an adequate relief obtained, which could not be obtained at law; that said surveys and said deeds made of said parcels by such tenants one to the other and to those in collusion with them, so admitted to record, have created clouds upon plaintiff's title, greatly depreciating its market value; that the making thereof under said combination and conspiracy called the "Citizens Union" was fraudulent; that no part or parcel of lands claimed by defendants under these deeds had ever been assessed upon the land books and no taxes ever paid; that these defendants applied to Stewart, county clerk of Wyoming county, to have these parcels placed upon such books, but he, knowing they had no title, refused to enter the parcels; that in the year 1905, however, when reassessment of the lands of the state under legislative act was made, the reassessor listed these parcels and placed them upon the land books, and that Stewart, clerk, unless enjoined, will extend them on the land books and they will be assessed with taxes for the year 1906; and, finally, that some of the defendants have been and are cutting timber upon said parcels, some have contracted to sell to the Welch Lumber Company the timber on such parcels, as shown by deeds made by them to such company, it well knowing, when it took such deeds, that they had no title and no right to sell. The prayer of this bill was that process issue; that certain defendants, officers of the "Citizens Union," be required to file its constitution, by-laws, and acts, with a list of its membership; that a decree be entered adjudging title to said 28,113 acres of land to be in plaintiff, free and acquit from all claims of defendants; that all of said deeds to defendants be canceled and set aside as clouds upon plaintiff's title; that said "Citizens Union" be decreed to be a fraudulent conspiracy against plaintiff, and be dissolved, and each member thereof be restrained from carrying out its purposes and from further asserting title to plaintiff's land; that Stewart, clerk, be enjoined from placing said parcels of land on the land books for taxation purposes; that the possession of the defendants be decreed to be the possession of plaintiff; that they be enjoined and restrained from cutting and removing timber from said lands and for general relief.

This bill was by order filed, remanded to rules, process issued thereon, was served upon defendants, and, no appearance having been entered by them thereto, at August rules, 1906, an order was entered taking the bill pro confesso against them. On the 28th day of September, following, the cause having been set down for hearing on that day, and no appearance or proceeding having been entered or taken by the defendants, a final decree was entered therein which decreed: (1) That an organization, comprised of defendants and others, known as the "Citizens Union," existed, and that it was an illegal and fraudulent conspiracy against plaintiff and against its title to and use and enjoyment of its land. (2) That the deeds executed by defendants, one to the other, conveying parts of plaintiff's land, were made in pursuance to and to carry out the illegal and fraudulent purposes for which said conspiracy was formed; that both grantor and grantee in said deeds knew that they and neither of them had any right, title, or interest in the land purporting to be conveyed thereby. (3) That the plaintiff is in the actual possession of all of its said land, under and by virtue of the tenancies created by the leases filed with its bill, and that the possession of the defendants (naming them) under and by virtue of the leases and subleases held by them, as well as under said

fraudulent deeds, is the actual possession of plaintiff of each and every part of its said land covered by said leases, subleases, and said deeds. (4) That the defendants have not any estate, right, title, or interest whatever in the tract of land of 28,113 acres; that plaintiff's title thereto is a good, valid, subsisting, and fee-simple one; that the defendants be and are forever enjoined and restrained from asserting any claim thereto adverse to plaintiff, and that certain defendants named, having forfeited their leases and subleases, surrender possession of the land held by them, whenever required by written notice so to do, under penalty of contempt. (5) That the several deeds, set forth and described in said decree, executed under and by virtue of said conspiracy, be and are, and each of them is, canceled, annulled, set aside, and held for naught, and the cloud created thereby upon plaintiff's title is removed, and plaintiff is quieted in its title and possession of said lands; that Stewart, clerk, aforesaid, is enjoined from placing or continuing said parcels or any of them upon the land books for taxation; that plaintiff recover costs from defendants. This decree, by the ending of the term at which it was rendered on November 19, 1906, became absolute and final under equity rule 19. In consequence, a motion to set it aside made by the defendants at the following term was overruled.

Thereupon in March, 1907, the defendants, Abraham Acord and 50 others, presented and were granted leave to file against the plaintiff, the Western Pocahontas Corporation, this bill of review and supplement, in which they allege that said decree is erroneous, and should be reversed and set aside, because: (1) That if the allegations of the original bill be true, and the leases set up were valid, then the relation of landlord and tenant was created, and as an action wherein a landlord is claiming land is an action at law, under section 723 of the Revised Statutes [U. S. Comp. St. 1901, p. 583], this court of equity was without jurisdiction to entertain said bill and enter said decree. (2) That the allegations of the original bill, if true, touching the alleged combination under the name of the "Citizens Union," are not acts that would give equity jurisdiction, as all could be as well remedied at law as in equity; that such acts as alleged do not warrant the decree finding such "Citizens Union" to be a fraudulent conspiracy, and in this particular it is erroneous. (3) That the allegations set forth in said original bill are insufficient to cause equity to take jurisdiction for the purpose of avoiding a multiplicity of suits. (4) That the allegations of said original bill do not show any cloud on title to the land of the plaintiff therein for the removal of which equity would have jurisdiction. (5) That under the allegations of said bill it appears that the plaintiff therein had a full and adequate remedy at law. Then by way of supplement this bill of review charges that since the entry of said decree complained of they have discovered new evidence not in the cause, but material and relevant, discovered since the entry, which could not have been discovered before by diligence, which is not cumulative, but existed prior to the decree's entry, although not discovered until afterwards. Condensing the allegations of this bill touching this new matter and the reasons why it was not discovered and presented, it is alleged that these original defendants, now plaintiffs in this bill of review, were poor and ignorant, living in a mountain section, far from the place where this court was held; that they had been living, and those in privity with them by contract, estate, or blood, upon the lands for periods from 10 to 50 years, under claim or color of title, in actual, adverse, exclusive, and uninterrupted possession, fixed as to boundaries and location; that, being served with summons in the original cause, they employed an attorney to defend their rights, furnished him with papers and information, and paid him a large sum of money; that their counsel lulled them to fancied security by informing them their interests were safe, so that they knew nothing of the entry of said decree until four months thereafter; that they then secured their present attorney to make investigation, and through his investigation ascertained and discovered the new matter aforesaid, which could not have been discovered by them alone with reasonable diligence because of its character.

This new matter of defense so discovered is alleged to be: That on April 4, 1902, J. O. Brown, agent for Joseph U. Crawford and others, contracted with one J. C. Maben, trustee, for not more than 35,000 acres of land in Raleigh and Wyoming counties, W. Va., at an alleged price of $28.50 per acre;

156 F.—63

that on June 24, 1902, Crawford and others organized under the laws of West Virginia the Western Pocahontas Coal & Lumber Company, with an authorized capital stock of $2,000,000; that on January 29, 1903, the said Maben and his co-trustee, Bell, conveyed to said Western Pocahontas Coal & Lumber Company the 28,113 acres of land in controversy, for an alleged consideration of $801,-220.50, of which $150,000 is alleged to have been paid down and a mortgage given upon the land to secure the balance, represented by two bonds, for $350,-585.25 each, due February 1, 1904, and 1905, with interest; that prior to April 1, 1905, the plaintiffs in this bill of review were in possession and asserting hostile claims to this land, and the Western Pocahontas Coal & Lumber Company was seeking to either oust them or compel them to acknowledge its title; that its agents did obtain the marks and signatures to leases by false representations and through the ignorance of their rights of said plaintiffs; that they at the time had a complete defense to any action said company might have brought, although they were ignorant of the character of such defense; that in this condition of affairs the officers and stockholders of the Western Pocahontas Coal & Lumber Company entered into a combination with those interested in the Chesapeake & Ohio Railroad Company to bring about a condition of affairs by which they could institute an action in the United States court, which combination and conspiracy has been discovered by said plaintiffs since said decree, although pre-existent; that at the time the Western Pocahontas Coal & Lumber Company was solvent, had a capital of $2,000,000, was in position to secure the money to pay off the mortgage debt to Maben and Bell, and could have placed bonds upon said lands for that purpose; that in pursuance of the plan to secure jurisdiction in the United States court it refused to pay said indebtedness, Maben and Catlett, trustees (Catlett having been appointed in place of Bell, deceased), about April 1, 1905, filed a bill in the circuit court of Raleigh county to enforce said mortgage, to which bill the Western Pocahontas Coal & Lumber Company filed an answer admitting the indebtedness, and on July 21, 1905, a decree was entered in favor of Maben and Catlett, trustees, therefor, and subsequently an order of sale was entered, which order appointed the attorney bringing the suit special commissioner to sell, and said sale was advertised to be made at public auction on the 16th of October, 1905; that on October 5, 1905, there was organized under the laws of Virginia, by the officers of the Chesapeake & Ohio Railway Company and others, among whom was Joseph U. Crawford, president of the Western Pocahontas Coal & Lumber Company, and James Knox Cain, who became secretary of the new corporation, a corporation styled the Western Pocahontas Corporation, with a capital of $250,000, whose object was to acquire 30,000 acres of land in West Virginia; that the first president of this new corporation was Crawford, president of the West Virginia corporation, but he was soon succeeded by Decatur Axtell, vice president of the Chesapeake & Ohio Railway Company, and James Knox Cain, the first secretary, was soon succeeded by C. E. Wellford, secretary of the railway company, and the officers of this new Virginia corporation were the officers of the Chesapeake & Ohio Railway Company; that Cain, secretary of this new corporation, filed a sworn statement with the Virginia Corporation Commission on October 10, 1905, in which he stated that the money raised from the stock issued was being used to purchase all the outstanding stock and in the payment of the debts of the Western Pocahontas Coal & Lumber Company owning the equity of redemption in "coal lands in Raleigh county, W. Va., containing approximately 28,000 acres, known as the 'Maben and Bell tract'"; that the Virginia corporation on October 10, 1905, owned all the stock and debts of the West Virginia corporation, and substantially both were controlled by the president and officers of the railway company; that the railway company agreed to guarantee bonds of the Virginia corporation to the extent of $750,000, to be secured upon the lands in controversy; that the West Virginia corporation, with $2,000,000 capital, was better able to issue this $750,000 of bonds than the Virginia corporation, with only $250,000 capital, and the railway company could have more safely guaranteed them; that on the day of sale the bid of the Western Pocahontas Corporation was the only one made; that it was $750,000, and was accepted by the commissioner, who received no cash; that said sale was confirmed by the circuit court of Raleigh county, and a deed was made by the com-

missioner to the Virginia corporation. It is then charged that this sale was a nullity, and was not in fact made; that the whole proceeding was for the purpose of fraudulently invoking the jurisdiction of this court; that so soon as discovered these plaintiffs in this bill of review, at the term following said decree, by motion and affidavit presented the facts to this court; that they do not file this bill for delay; and that this court had no jurisdiction of said original cause.

To this bill of review the defendant, the Western Pocahontas Corporation, has filed a demurrer, assigning nine grounds, and the plaintiffs have tendered nine separate written motions to strike out these grounds of demurrer for reasons therein set forth, and upon this demurrer and these motions this hearing is had.

Arthur English, for plaintiffs.

J. Lewis Bumgardner, Vinson & Thompson, and Simms & Enslow, for defendant.

DAYTON, District Judge (sitting specially, after stating the facts as above). All possible questions, technical or otherwise, I think, that could arise in this case, have been argued at great length and with ability, both orally and in briefs filed by counsel. I am not inclined to regard it necessary to enter into an extended consideration of the technical and formal requirements of the demurrer involved in the statement of its nine grounds and the nine written motions to exclude. The law is well settled that a bill of review is maintainable after the term of entry of final decree generally for two reasons: First, for error therein apparent upon its face; and, second, on account of newly discovered evidence, material in character, that could not earlier have been discovered with due diligence. Bank of U. S. v. Ritchie, 8 Pet. 128, 8 L. Ed. 890; Clark v. Killian, 103 U. S. 766, 26 L. Ed. 607; Osborne v. San Diego, etc., Co., 178 U. S. 22, 20 Sup. Ct. 860, 44 L. Ed. 961; Hill v. Phelps, 41 C. C. A. 569, 101 Fed. 650; Beard v. Burts, 95 U. S. 434, 24 L. Ed. 485.

Where error of law is the ground assigned, this must be shown from the pleadings, proceedings, and decree, without reference to the evidence. No other question is open. Putnam v. Day, 22 Wall. 60, 22 L. Ed. 764; Willamette Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629. To such bill of review for error of law a demurrer is both admissible and proper, and it only admits such facts as are properly pleaded. As questions of fact are not open for re-examination on a bill of review for errors in law, the truth of any fact averred in that kind of a bill of review, inconsistent with the decree, is not admitted by a demurrer, because no error can be assigned on such a fact, and it is, therefore, not properly pleaded. Shelton v. Van Kleeck, 106 U. S. 532, 1 Sup. Ct. 491, 27 L. Ed. 269.

When such bill of review is based upon newly discovered evidence, it can only be filed by leave of the court in its sound discretion, cautiously and sparingly exercised; and, even if such evidence would change the decree, the court may refuse to reopen the decree, if productive of mischief to innocent parties. Thomas v. Harvie's Heirs, 10 Wheat. 151, 6 L. Ed. 287; Rubber Co. v. Goodyear, 9 Wall. 805, 19 L. Ed. 566; Ricker v. Powell, 100 U. S. 104, 25 L. Ed. 527; Craig v. Smith, 100 U. S. 226, 25 L. Ed. 577. The evidence must be new,

or else such as the party could not by diligence have known. The failure to produce it, if existent at the time of decree, must be accounted for. It must be controlling, not merely cumulative, not mere impeachment of witnesses, or only increasing doubt as to the real truth. Beard v. Burts, 95 U. S. 434, 24 L. Ed. 485; Rubber Co. v. Goodyear, 9 Wall. 805, 19 L. Ed. 566; Easley v. Kellom, 14 Wall. 279, 20 L. Ed. 890; Freeman v. Clay, 2 C. C. A. 587–593, 52 Fed. 1; Southard v. Russell, 16 How. 569, 14 L. Ed. 1052; Society of Shakers v. Watson, 23 C. C. A. 263, 77 Fed. 512.

A bill of review for errors of law can be filed without leave of the court, but on account of newly discovered evidence only by such leave. The two grounds may be joined, but in such case the bill can only be filed by leave. Ricker v. Powell, 100 U. S. 104, 25 L. Ed. 527; Whiting v. Bank, 13 Pet. 13, 10 L. Ed. 33. The ground of error in law, with that of impeachment for fraud, it is true, is doubted in Kimberly v. Arms (C. C.) 40 Fed. 548–559, where Judge Jackson points out that a bill of review to impeach for fraud designs a destruction of the decree in toto, while one based on errors of law has no other scope than to correct such errors. In fact, a bill to impeach for fraud should be considered generally as an original bill. Where the grounds are to correct errors or modify the decree, either by reason of errors on its face or on account of newly discovered evidence, no good reason, it seems to me, is apparent why the two grounds should not be joined and the bill filed by leave of the court. If the objection of multifariousness be urged, it is always to be remembered that the determination of the question of whether a bill is multifarious is one largely within the sound discretion of the court, and dependent to a very considerable degree upon the particular facts of each case. United States v. Bell Telephone Co., 128 U. S. 315, 9 Sup. Ct. 90, 32 L. Ed. 450; Walker v. Powers, 104 U. S. 245, 26 L. Ed. 729; Brown v. Trust Co., 128 U. S. 403, 9 Sup. Ct. 127, 32 L. Ed. 468; South Penn Oil Co. v. Calf Creek Co. (C. C.) 140 Fed. 507–516.

Under the ruling of Camden v. Ferrell, 50 W. Va. 119, 40 S. E. 368, it is held that a bill of review based on newly discovered evidence does not lie to a decree by default; but I agree with plaintiffs' counsel that this distinction is not made in federal practice, as shown by ruling in Thomson v. Wooster, 114 U. S. 104, 5 Sup. Ct. 788, 29 L. Ed. 105. Finally, it may be stated as a well-settled rule that, if neither error of law nor new evidence be shown, leave to file it may be refused, or, if granted, the bill may be dismissed, because leave to file was improvidently granted.

With these well-settled principles before us, the grounds set forth in this bill of review for reversal of the decree can be reduced to two propositions: First, error in law, for that it is alleged the original plaintiff, having an adequate remedy at law, had no standing in equity; second, error in fact, in that a fraud upon the jurisdiction of this court was committed, the evidence of which existed at the time, but was not discovered until after the entry of said decree.

Considering the first proposition, it is well settled that a bill of review for errors of law is in the nature of a writ of error, and must be governed practically by the same rules governing appellate courts

in considering writs of error. Story's Equity Pleading, § 403. It has been held that where the subject-matter of a suit belongs to the class over which a court of equity has jurisdiction, and the objection that the complainant has an adequate remedy at law is not made until the hearing in the appellate tribunal, such objection is too late. Reynes v. Dumont, 130 U. S. 354, 9 Sup. Ct. 486, 32 L. Ed. 934; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82. Also, failure to make before final hearing the objection of equitable jurisdiction because of an adequate remedy at law is a waiver thereof, and authorizes the court to retain the cause, if the case be one of such a nature that equity might give the relief asked, or any part of it, or if the question of equitable jurisdiction be even a doubtful one. Waite v. O'Neil (C. C.) 72 Fed. 348. In this last case Judge Hammond points out that only one other case (Dederick v. Fox [C. C.] 56 Fed. 714) applied this rule, relating generally to such objection in appellate courts, to courts of original jurisdiction, yet he reasons very forcibly that the rule was imported into the appellate courts of this country from the English High Court of Chancery and other courts of original cognizance, and therefore no sound reason exists for limiting the rule to appellate courts alone. However this may be in ordinary cases, I feel sure that the strongest reason exists for the application of such rule in a case like this, where the defense is set up for the first time in a bill to review a decree based upon a bill taken for confessed, and that the question narrows itself down to one of simply determining whether the original bill on its face would have been subject to demurrer as absolutely void of equitable jurisdiction. Its allegations of fact must be taken as absolutely true, because confessed; and it becomes, therefore, in a sense immaterial whether the exhibits in the nature of evidence be considered as parts of the bill or not. It is proper to state in that connection, however, that to hold that they are not, as contended for by plaintiffs' counsel, would be to hold counter to a practice in this court and the courts of this state maintained without question for very many years.

From these allegations of fact we must hold (a) that the Western Pocahontas Corporation is a Virginia corporation; (b) that the defendants to said original bill were all residents of West Virginia; (c) that the amount in controversy exceeded $2,000 in value; (d) that the corporation had absolute fee-simple title to the 28,113 acres of land in controversy, and (e) was in full and complete possession of the tract and every part of it; (f) that the defendants had no right, title, color, or claim of title whatever to it or any part of it; (g) that their possession was not adverse, but solely that of tenants for the corporation under written leases legally executed; (h) that, being so in possession, they unlawfully combined, confederated, and conspired together to defraud the corporation and secure illegally its said land; (i) that in pursuance of such combination and conspiracy they as tenants, in violation of their legal duty and obligation as such, executed many deeds one to the other of various parcels of said lands, which said deeds purported to convey and vest in the grantees therein full legal title to the parcels conveyed by specified metes and bounds fully descriptive of such parcels, and whereby they could be identified; and

(j) that they caused these deeds to be placed upon the public records and said parcels of land upon the assessment books for taxation purposes in the counties where said lands were situate.

Leaving out of consideration the further allegations of the bill touching multiplicity of suits, do not these facts present a basis for equitable intervention? I think clearly so. There is no better established ground for equitable jurisdiction than an appeal to remove cloud from and quiet title to real estate. It is recognized, not alone by decisions of the federal and state courts, but by federal statute as well. It is not only so recognized, but favored, for by Act March 3, 1875, c. 137, § 8, 18 Stat. 472 [U. S. Comp. St. 1901, p. 513], express exception to the law limiting jurisdiction of federal courts to civil suits brought in the district whereof the defendant is an inhabitant is made of suits "to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon, the title to real or personal property," which suits may be brought in the district wherein such property is situate.

The contention that these deeds, having no antecedent source of title, were void, and therefore constituted no clouds upon the title of the corporation, is wholly untenable. I entirely agree with counsel for the corporation that any deed, devise, or other instrument, judgment, or decree, not void on its face, which purports to convey any interest in or makes any charge upon land of the true owner, the invalidity of which requires proof by extrinsic evidence, is a cloud upon the legal title of the owner in possession. And, futher, any pretended conveyance which, if left undisturbed, may ripen into a perfect title, must necessarily create a cloud upon the true title. Statutes and decisions of courts of last resort of the several states defining what may or may not constitute cloud on title, what may or may not constitute title itself or claim or color of title, and what may by possession ripen into good title, although void in initio, are parts of the substantive law of such states, affecting real estate therein, and therefore are of controlling influence in federal courts held within such states, under well-settled authority. Looking to the decisions of the West Virginia Supreme Court of Appeals to guide us, we find the foregoing definitions of what may constitute cloud on title to be fully established by such cases as Smith v. O'Keefe, 43 W. Va. 172, 27 S. E. 383; Waldron v. Harvey, 54 W. Va. 608, 46 S. E. 603, syl. 21, 102 Am. St. Rep. 959; Robinson v. Lowe, 50 W. Va. 75, 40 S. E. 454; Bennett v. Pierce, 50 W. Va. 604, 40 S. E. 395; Ambler v. Leach, 15 W. Va. 677; Garrett v. Ramsay, 26 W. Va. 345; Moore v. McNutt, 41 W. Va. 695, 24 S. E. 682. There can be no question, therefore, that these deeds did constitute such clouds upon title as would warrant an appeal to equity to remove them.

But it is insisted that equity can only remove such clouds when the plaintiff asking such removal is in possession, and that on the face of this bill the plaintiff corporation admitted that it had instituted an action of ejectment against defendants therein, which could only be brought by one out of possession and which by the averments of its declaration declared itself to be out of and said defendants in possession. The first part of this contention, that equity can intervene only

in behalf of a plaintiff in possession, is true beyond question; but the latter part, that such intervention is barred by the institution of the action of ejectment is untenable for two reasons:

First, because the action of ejectment, being an action at law, federal practice follows that of the state, and in West Virginia that practice, regulated by express statute, does not require a person to be out of possession in order to institute it. As pointed out by Judge Brannon in Moore v. McNutt, 41 W. Va. 695, 24 S. E. 682, by the Code of 1849 the writ of right was abolished and the action of ejectment was made applicable to perform its function of trying title. It became a "statutory action of ejectment." As such, under chapter 90, Code W. Va. 1906, regulating it, it is expressly provided that it may be brought in every case where writ of right prior to 1850 could be brought. This writ, when in existence, could be brought, regardless of possession, to try title. It further prescribes in section 7 of that chapter the requisite averments for the declaration in ejectment, to the effect that, plaintiff being possessed of the premises on a certain day, the defendant entered into such premises and unlawfully withholds from the plaintiff the possession thereof, thereby retaining the old common-law form. Under such circumstances the institution of such a statutory action with such scope, but bounded by such form, could not constitute an estoppel to the owner to claim title and possession. Again, the defendant's possession under many circumstances may be a limited possession, and not hostile and adverse. There can be no question, I think, under the wide scope given it by this statute, that this action can be brought by the landlord to recover possession from a tenant whose lease has expired, or who has violated its conditions, although the action of unlawful detainer may practically be more expeditious and less expensive.

But, second, the right to equitable intervention is not destroyed because, as Judge Brannon says in Moore v. McNutt, supra: "The plaintiff being in possession, had the right to go into equity. Even if he could maintain ejectment, that would not debar him from chancery, because the jurisdiction in such case in chancery, having been established long before the Code of 1849, which is the first time the right to maintain ejectment by one in possession arose, the jurisdiction of chancery would not be ousted by the new act." To the same effect is the ruling of this court in Lasher v. McCreery (Judges Goff and Jackson sitting together) 66 Fed. 834, at pages 842, 843, and in Miller v. Ahrens, 150 Fed. 644. See, also, Smythe v. Henry, 41 Fed. 705. The conclusion follows that this bill of review cannot be maintained for the alleged errors of law.

As to the supplemental matter, it is to be borne in mind that the facts are presented solely to show that this court did not have jurisdiction; that a fraud had in fact been committed upon its jurisdiction, in that the transfer of this tract of land was effected from the Western Pocahontas Coal & Lumber Company, the West Virginia corporation, to the Western Pocahontas Corporation, the Virginia corporation, solely to enable the suit to be brought in this, instead of the state, court. It is claimed the facts presented by this supplement bring this case squarely within the principles of a class of cases of which the

case of Lehigh Mining & Mfg. Co. v. Kelley, 160 U. S. 327, 16 Sup. Ct. 307, 40 L. Ed. 444, may be taken as the best example. I have gone over time and again these facts as presented here, each time with an increased conviction that in very many and very material particulars they do not coincide with those of the Lehigh Case, and it must be conceded, in the very nature of things that the facts in each case are all essential to determine whether the principles enunciated there are applicable. In the Lehigh Case the agreed facts show that the conveyance from the Virginia to the Pennsylvania corporation was made direct, that the stockholders were the same in both companies, that the organization of the Pennsylvania corporation and the conveyance to it were expressly made to secure jurisdiction in the federal court over the controversy, and that both corporations are existent. Here the conveyance was not voluntarily and directly made. On the contrary, it is conceded that the West Virginia corporation was indebted for purchase money due and unpaid for the land more than $700,000; that a valid mortgage subsisted upon the land to secure this indebtedness; that suit, with process regularly served, was instituted in the circuit court of Raleigh county, W. Va., to foreclose this mortgage by the trustees to whom the debt was due and payable; that the debtor, the West Virginia corporation, answered the bill, admitting the indebtedness and decree of sale was entered, and sale publicly made and regularly confirmed by this state court of competent jurisdiction.

In the second place, it is not charged that the stockholders in the Virginia corporation, which became the purchaser, are precisely the same as in the West Virginia corporation, although the officers are said to have been at the time of organization of the former identical. On the contrary, it is charged that officers of the Chesapeake & Ohio Railway Company, not stockholders of the West Virginia company, organized, dominated, and controlled the Virginia company; that the stock issue of this latter was fixed at $250,000, and was used, pending the foreclosure suit, in the purchase of the stock and payment of the debts of the West Virginia company having the equity of redemption in said land; that the new company executed its bonds for $750,000, which were guaranteed by the Chesapeake & Ohio Railway Company, with which the purchase price at the foreclosure sale was settled. It is true it is charged that the West Virginia corporation, with its large authorized capital, could as well have floated these bonds, and the railway could as securely have guaranteed its bonds as those of the Virginia corporation. This may have been true; but there was no obligation upon the railway company to indorse the bonds of either, and, if it was willing to indorse those of the one and not those of the other, no fraud can be imputed to its action on that account.

Finally, it appears by the public records of this state, of which I must take judicial notice, that in February, 1906, substantially four months before the institution of the original suit herein, the Western Pocahontas Coal & Lumber Company, the West Virginia corporation, was wholly dissolved and ceased to have any existence whatever. See West Virginia Corporation Report of Secretary of State, March 4, 1905, to March 1, 1907, page 874 (under head of dissolutions). Un-

der these entirely different conditions I do not think the principles laid down in the Lehigh Case can apply. It is to be remembered that in that case an able dissenting opinion was filed by Mr. Justice Shiras, in which two other members of the court joined, from which we may reasonably assume that the facts as therein presented made the question a close one. I am therefore convinced, after a long and careful study of the facts presented by this bill of review, that they are not sufficient to establish a collusive transfer to make parties, such as is contemplated by the inhibition of the acts of Congress of 1875, 1887, and 1888, and that I therefore originally erred in granting leave to the plaintiffs herein to file it.

But, in addition to this, I am convinced that to raise this question of jurisdiction for the first time by bill of review comes entirely too late. I carefully considered this question in Briggs v. Traders' Co. (C. C.) 145 Fed. 254, and there pointed out the fact that prior to the act of 1875 the common-law rules touching the necessity of a plea in abatement to the jurisdiction prevailed in the federal courts, and a filing of a plea or answer to the merits waived the question of jurisdiction, as held in Farmington v. Pillsbury, 114 U. S. 138, 143, 5 Sup. Ct. 807, 29 L. Ed. 114; that this act of 1875 did not change the general scope of the rule enunciated in Farmington v. Pillsbury, but authorized the court as of right and duty without plea or motion, at any time during the progress and pendency of the suit, to stop all proceedings and dismiss the cause the moment a fraud on its jurisdiction was discovered, as held in Hartog v. Memory, 116 U. S. 588, 590, 6 Sup. Ct. 521, 29 L. Ed. 725, and Williams v. Nottawa, 104 U. S. 209, 211, 26 L. Ed. 719. A thorough reconsideration of the question convinces me that the provisions of this act do not either require or warrant the exercise of this power to the extent of reversing a final decree in an ended cause by reasons of extrinsic facts presented for the first time in a bill of review.

But, to go a step farther, if I had this power, I am finally convinced that the allegations of this bill as to diligence in discovering these facts fall short of the requirements of the law. It is admitted that they all existed prior to the entry of the decree and largely depended upon matters of public record. The essence of the reason assigned for their nondiscovery by these plaintiffs is their own poverty and ignorance and the default of their own counsel. No matter how much sympathy courts may have for the poor and ignorant, they must remember that they are to administer justice without respect to persons, and do equal right to the poor and to the rich according to fixed laws and rules, ignorance of which can excuse no one, rich or poor, wise or ignorant. It is too well settled to need discussion that default, negligence, or misconduct on the part of counsel toward his client will not excuse that client of neglect to meet the law's requirements, unless the attorney's conduct be in fraud and collusion with his client's adversary. No such charge is made here, and it is very apparent that when present counsel, employed after the decree complained of was entered, made his careful and searching investigation, he was able to discover these pre-existing facts.

Therefore in any and all phases of the case I must hold that the

demurrer to this bill of review, because of alleged errors apparent upon the face of the decree complained of, must be sustained, and as to the supplement the facts set forth therein are insufficient, and the leave to file the same was improvidently granted; and the bill in its entirety must be dismissed.